i

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

The Diocese of Rochester and
The Diocese of Buffalo, N.Y.,

      Plaintiffs,

      v.                                          Civil Action No.: 6:20-cv-06243 EAW

The U.S. Small Business Administration
and Jovita Corranza, solely as the Administrator
of the U.S. Small Business Administration,

      Defendants.

_____

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**

**PRELIMINARY INJUNCTION**

Dated:  April 27, 2020          BOND, SCHOENECK & KING, PLLC
                            Stephen A. Donato
                            Charles J. Sullivan
                            Brian J. Butler
                            One Lincoln Center
                            Syracuse, NY 13202-1355
                            Telephone: (315) 218-8000
                            Fax: (315) 218-8100
                            sdonato@bsk.com
                            csullivan@bsk.com
                            bbutler@bsk.com

                            *Attorneys for the Plaintiffs The Diocese of*
                            *Rochester and The Diocese of Buffalo, N.Y.*

**<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 2

ARGUMENT ............................................................................................................................... 7

    I.  The SBA's Implementation of the PPP Violates the Administrative Procedure Act. ............ 7

    II.  The PPP Applications Discriminate Against the Plaintiffs as Bankruptcy Debtors and Violate
          Section 525 of the Bankruptcy Code.................................................................................. 14

    III.  This Court should Enjoin the SBA from Disqualifying the Plaintiffs as an Eligible Applicants
           Under the PPP. .................................................................................................................. 17

CONCLUSION .......................................................................................................................... 21

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdul Wali v. Coughlin*,
   754 F.2d 1015 (2d Cir. 1985) ......................................................................................... 18

*In re Am. Film Techs., Inc.*,
   175 B.R. 847 (Bankr. D. Del. 1994) ............................................................................... 21

*Am. Soc. of Composers, Authors, & Publishers by Bergman v. Pataki*,
   930 F. Supp. 873 (S.D.N.Y. 1996) ................................................................................. 17

*Brenntag Int'l Chems., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999) ........................................................................................... 19

*Buckingham Corp. v. Karp*,
   762 F.2d 257 (2d Cir. 1985) ........................................................................................... 19

*Catskills Mts. Chptr of Trout Unlimited v. EPA*,
   846 F.3d 492 (2d Cir. 2017) ............................................................................................. 9

*Chevron U.S.A, Inc. v. NRDC*,
   467 U.S. 837 (1984) .......................................................................................................... 9

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) .......................................................................................................... 8

*Doran v. Salem Inn, Inc.*,
   422 U.S. 922 (1975) ........................................................................................................ 19

*Envtl. Source Corp. v. Mass. Div. of Occupational Safety*,
   431 B.R. 315, 322 (Bankr. D. Mass. 2010) .................................................................... 14

*Friends of the E. Hampton Airport Inc. v. Town of E. Hampton*,
   841 F.3d 133 (2d Cir. 2016) ........................................................................................... 17

*Jama v. Immigration & Customs Enforcement*,
   543 U.S. 335 (2005) ........................................................................................................ 11

*JBR, Inc. v. Keurig Green Mt., Inc.*,
   618 F. App'x 31 (2d Cir. 2015) ...................................................................................... 17

*Lane v. Phila. Newspapers, LLC (In re Phila. Newspapers, LLC)*,
   423 B.R. 98 (E.D. Pa. 2010) ........................................................................................... 18

*In re Mart i.l.v.e.s. Goldrich*,
   45 B.R. 514 (Bankr. E.D.N.Y. 1984) ............................................................................. 15

i

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................ 8

*Perez v. Campbell*,
  402 U.S. 637, 91 S. Ct. 1704, 29 L. Ed. 2d 233 (1971)............................... 15

*Rickel Home Centers, Inc. v. Baffa (In re Rickel Home Centers, Inc.)*,
  199 B.R. 498 (Bankr. D. Del. 1996)........................................................... 21

*In re Rose*,
  23 B.R. 662 (Bankr. D. Conn. 1982)........................................................... 15

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
  241 F.3d 232 (2d Cir. 2001) ........................................................................ 18

*Singh v. U.S. Dep't of Justice*,
  461 F.3d 290 (2d Cir. 2006) ........................................................................ 12

*Stoltz v. Brattleboro Hous. Auth. (in Re Stoltz)*,
  315 F.3d 80 (2d Cir. 2002) .......................................................................... 16

*Troy Corp. v. Browner*,
  120 F.3d 277 (D.C. Cir. 1997)...................................................................... 8

*United States v. Shabani*,
  513 U.S. 10 (1994) ...................................................................................... 11

*In re W.R. Grace & Co.*,
  412 B.R. 657 (D. Del. 2009) ...................................................................... 21

**Statutes**

5 U.S.C. § 701 .................................................................................................. 7

5 U.S.C. § 705 ................................................................................................ 17

5 U.S.C. § 706(2)(A)............................................................................. 8, 12, 13

5 U.S.C. § 706(2)(C) ..................................................................................... 7, 8

11 U.S.C. § 101................................................................................................. 2

11 U.S.C. § 101(27) ....................................................................................... 14

11 U.S.C. § 106 .............................................................................................. 14

11 U.S.C. § 503 .............................................................................................. 12

11 U.S.C. § 525(a) ......................................................................................... 14

Administrative Procedure Act........................................................................... 2

ii

CARES Act ........................................................................................................................... *passim*

CARES Act, section 1114 ................................................................................................. 3

CARES Act § 4003(c)(3)(D) ........................................................................................ 9, 11

CARES Act § 4003(c)(3)(D)(i) ....................................................................................... 10

**Other Authorities**

13 C.F.R. §§ 120.110(k) and 123.301(g) ........................................................................ 6

13 CFR 120.10 ................................................................................................................. 5

13 CFR 120.110 ............................................................................................................... 5

H.R.Rep. No.595, 95th Cong., 1st Sess. 366-267 (1977) ............................................. 14

S.REP. No. 989, 95th Cong., 2d Sess. 81 (1978) .......................................................... 14

1978 U.S. CODE CONG. & ADMIN. NEWS 5787 ............................................................ 14

1978 U.S. CODE CONG. & ADMIN. NEWS 5963 ............................................................ 14

iii

**PRELIMINARY STATEMENT**

The Diocese of Rochester (the "Diocese of Rochester") and the Diocese of Buffalo (the "Diocese of Buffalo", collectively, the "Plaintiffs"), like many other businesses, have been financially affected by the COVID-19 pandemic in ways that could not have been foreseen.  The New York State "stay at home" directive that requires 100 percent of the state's non-essential workforce to stay home and prohibits gatherings of more than 10 people has further exacerbated this crisis for the Plaintiffs.  One of the most significant sources of revenue for the Plaintiffs are those fees and charges paid by the parishes and other Catholic entities within the territory of each Diocese for various forms of operational support that the Plaintiffs provide to their respective parishes.  The parishes, in turn, derive a significant portion of their revenue from offertory collection during masses.  Because masses have been suspended, there has been an interruption in offertory collections which has negatively impacted the ability of the parishes to meet their financial obligations to the Plaintiffs.  As a result, the Plaintiffs have experienced a sudden decline in revenue and anticipate that for as long as the "stay at home" directive remains in effect it will struggle to continue making payroll payments.  Because current economic conditions have dramatically reduced Plaintiffs' income from ongoing operations, they are clearly among those businesses upon whom Congress intended, when it passed the CARES Act (defined below), to confer a benefit through the Paycheck Protection Program (the "PPP") (as discussed more fully below).

In order to make PPP loans broadly available, Congress set forth in the CARES Act the specific requirements that borrowers are required to meet in order to be eligible to participate in the PPP.  The Plaintiffs are able to satisfy all the borrower requirements set forth in the CARES Act, and should therefore be eligible to participate. However, although nothing in the CARES Act permits it, the SBA has decided to add an eligibility requirement to the PPP.  The SBA has

determined that it will not authorize any PPP loans for borrowers who are debtors in bankruptcy. This requirement is not supported by any statutory language in the CARES Act. By disqualifying bankruptcy debtors from the PPP, the SBA has violated the law in two ways: First, the SBA has acted unlawfully and in excess of its authority in violation of the Administrative Procedure Act. Second, by creating a special disqualification for debtors in bankruptcy, the SBA has violated the anti-discrimination provision of Section 525 of the Bankruptcy Code.

Plaintiffs submit this amended memorandum of law in support its motion for a preliminary injunction. In this motion, the Plaintiffs seek a preliminary injunction (1) prohibiting the SBA from denying the Plaintiffs a loan under the PPP based on the Plaintiffs' status as chapter 11 debtors or otherwise taking any action, or failing to take any action, in the processing of Plaintiffs' PPP applications, that would disqualify Plaintiffs from participating in, or limit Plaintiffs' access to, the PPP based Plaintiffs' status as chapter 11 debtors, and (2) enjoining the SBA from disbursing from the PPP an amount equal to the total amount requested in the Plaintiffs' combined loan applications, or $2,836,096.

## STATEMENT OF FACTS

### A. Diocese of Rochester Bankruptcy

On September 12, 2019 (the "Rochester Petition Date"), the Diocese of Rochester filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*, the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New, commencing the Diocese of Rochester's chapter 11 case (the "Rochester Chapter 11 Case"). The Diocese of Rochester continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for a trustee has been made in the Rochester Chapter 11 Case.

2

**B. Diocese of Buffalo Bankruptcy**

On February 28, 2020 (the "Buffalo Petition Date"), the Diocese of Buffalo filed a voluntary petition for relief under chapter 11 of Bankruptcy Code with the United States Bankruptcy Court for the Western District of New York, commencing the Diocese of Buffalo's chapter 11 case (the "Buffalo Chapter 11 Case"). The Diocese of Buffalo continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for a trustee or examiner has been made in the Buffalo Chapter 11 Case.

**C. Paycheck Protection Program**

On March 27, 2020, the President of the United States signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). CARES Act, S. 3548, 116th Cong. (2020). The CARES Act is intended, among other things, to provide stimulus to the economy by distributing approximately $2.3 trillion to various industries, programs, and individuals.

Among the programs established by the CARES Act is the PPP. The PPP is set forth in Title I of the CARES Act, and provides, among other things, funding for forgivable loans to small businesses that are affected by COVID-19. The PPP is a temporary, short-term program under which eligible borrowers may apply for and receive loans from private banks that are guaranteed by the federal government.[1] The funding for guarantees under the PPP is limited. As initially enacted, the CARES Act appropriated $349 billion in funds for PPP loan guarantees. Subsequently, on April 24, 2020, an additional $310 billion was appropriated for the PPP.

In the CARES Act, Congress carefully circumscribed the SBA's authority to establish borrower requirements under the PPP. Specifically, Congress dispensed with the ordinary

---

[1] The PPP covers loans that are issued between February 15, 2020 until June 30, 2020.

creditworthiness framework that guides the SBA's decision making under other programs, and instead expressly set forth the requirements that a PPP borrower is required to meet.   The requirements are set forth in Section 1102(a)(2) of the CARES Act, which amends Section 7(a) of the Small Business Act (15 U.S.C. § 636).   In that section, Congress set forth the "Borrower Requirements" for a PPP loan, requiring only that a loan applicant certify the correctness of the following information:

> (G)   BORROWER REQUIREMENTS—
>
>> (i)   CERTIFICATION – An eligible recipient applying for a covered loan shall make a good faith certification—
>>
>>> (I)   That the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient;
>>>
>>> (II)   acknowledging that funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments;
>>>
>>> (III)   that the eligible recipient does not have an application pending for a loan under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan; and
>>>
>>> (IV)   during the period beginning on February 15, 2020 and ending on December 31, 2020, that the eligible recipient has not received amounts under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan.

CARES Act § 1102(a)(2).

On April 2, 2020, the SBA issued an interim final rule (the "First Interim Rule") providing guidance on, among other things, the eligibility requirements for loans under the PPP.   The First Interim Rule does not establish any criteria for eligibility for the PPP relating to whether the applicant is a debtor in bankruptcy.   Rather, consistent with the underlying purpose of the CARES Act, the First Interim Rule acknowledges that Congress specifically established the borrower requirements for the PPP, clarifying that the SBA's rules for loan eligibility do not apply to the

4

extent that they are inconsistent with the eligibility requirements set forth by Congress in the CARES Act.[2]  For example, in the First Interim Rule, in explaining the purpose and intent of the CARES Act's borrower requirements, the SBA recognized that "[t]he intent of the Act is that SBA provide relief to America's small businesses expeditiously, which is expressed in the Act by giving all lenders delegated authority and streamlining the requirements of the regular 7(a) loan program." First Interim Rule at 5.  The SBA then recognized that the CARES Act's statutory borrower requirements necessarily swept away the SBA's ordinary rules for assessing borrower eligibility:

> [F]or loans made under the PPP, SBA will not require the lenders to comply with section 120.150 "What are SBA's lending criteria?" SBA will allow lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness.

First Interim Rule at 5.

Furthermore, the First Interim Rule further explains that "[t]he program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement (as defined in 13 CFR 120.10)."  First Interim Rule at 5.

Finally, the First Interim Rule adopts the ineligibility standards set forth in section 120.110 title 13 the Code of Federal Regulations ("CFR 120.110"), as further described in SBA's Standard Operating Procedure 50-10, Subpart B, Chapter 2 ("SOP 50-10").[3]  *See* First Interim Rule at 8, ¶ 2(c) ("Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and further

---

[2] The First Interim Rule is attached to the Declaration of Brian J. Butler, Esq. in Support of Motion for Preliminary Injunction as Exhibit 2.

[3] Available at https://www.sba.gov/sites/default/files/files/serv_sops_50105b_0_5.pdf.

described further in SBA's Standard Operating Procedure").[4]  Bankruptcy debtors are not the listed

as an ineligible business under any of these SBA regulations.[5]

On April 14, 2020, the SBA issued a supplemental interim final rule ("the Second Interim

Rule") further providing guidance on the PPP.  Like the First Interim Rule, the Second Interim

Rule lacks any provision purporting to render debtors in bankruptcy ineligible for the PPP.[6]  The

Second Interim Rule supplemented the First Interim Rule with additional guidance regarding the

application of rules regarding when a borrower and affiliates of a borrower will be considered a

single entity for purposes of the PPP.  *See* Second Interim Rule at 3-10.

The SBA published the forms that borrowers and lenders are required to use when applying

for a PPP loan. *See* Paycheck Protection Program Borrower Application Form, SBA Form 2483

---

[4] The SOP 50-10 provides that a "Small Business Applicant" must, among other things:

    i.    Be an operating business;

    ii.    Be organized for profit;

    iii.    Be located in the United States;

    iv.    Be small (as defined by the SBA); and

    v.    Demonstrate the need for the desired credit.

*See* SOP 50-10, pg. 85.  The SOP 50-10 also provides that the businesses listed in CFR 120.110 are not eligible for an SBA loan.

[5] The SBA has clarified that religious organizations are eligible for loans under the PPP. On April 3, 2020, the SBA issued the "Faith-Based Organizations FAQ" that established, among other things, that the SBA is taking the position that "faith-based organizations are eligible to receive SBA loans regardless of whether they provide secular social services. That is, no otherwise eligible organization will be disqualified from receiving a loan because of the religious nature, religious identity, or religious speech of the organization.  The requirements in certain SBA regulations— 13 C.F.R. §§ 120.110(k) and 123.301(g)—impermissibly exclude some religious entities. Because those regulations bar the participation of a class of potential recipients based solely on their religious status, SBA will decline to enforce these subsections and will propose amendments to conform those regulations to the Constitution."  *See* Faith-Based Organizations FAQ  (attached to the Declarations of Lisa M. Passero and Charles Mendolera, as Exhibit A).

[6] The Second Interim Rule is attached to the *Declaration of Brian J. Butler, Esq. in Support of Motion for Preliminary Injunction* as **Exhibit 3**.

(attached as Exhibit A to the Amended Complaint); Paycheck Protection Program Lender Application Form, SBA Form 2484 (attached as Exhibit B to the Amended Complaint). Both the Borrower Application and the Lender Application require the applicant to certify that the borrower is not a debtor in bankruptcy. The forms contain no discussion of why the SBA sought to treat debtors in bankruptcy differently from other applicants under the PPP.

On April 24, the SBA issued a further supplemental interim final rule ("the <u>Third Interim Rule</u>"). In the Third Interim Rule, the SBA purported to disqualify debtors in bankruptcy from participating in the PPP.[7] The SBA offered the following justification for its action: "The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans. In addition, the Bankruptcy Code does not require any person to make a loan or a financial accommodation to a debtor in bankruptcy." Third Interim Rule at 8. The Third Interim Rule provides no further information regarding why the SBA determined that bankruptcy debtors should be ineligible for PPP loans. For example, the SBA did not discuss why giving PPP loans to bankruptcy debtors would present a special risk of unauthorized use of funds, nor did the SBA seek to reconcile its concern of repayment with Congress's decision to make PPP loans broadly available and forgivable

### ARGUMENT

**I.    The SBA's Implementation of the PPP Violates the Administrative Procedure Act.**

Under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA"), courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

---

[7] The Third Interim Rule is attached to the *Supplemental Declaration of Brian J. Butler, Esq. in Support of Motion for Preliminary Injunction, dated April 27, 2020,* as **Exhibit 4.**

Further, the APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). A court's analysis of APA section 706(2)(C) "naturally begins with a delineation of the scope of the [agency's] authority and discretion" and then requires the court to determine whether the agency's action was made within that scope of authority. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, (1971). When analyzing whether an agency's action was arbitrary or capricious, courts must determine whether "the agency has complied with the APA; specifically, whether . . . it has acted consistently with its own procedures; and whether its applications of its governing law have been reasonable." *Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" and judicial relief is appropriate where an agency fails to meet this standard. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Further, an agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See id*.

There is no statutory basis for the SBA's decision to exclude debtors in bankruptcy from participation in the PPP. The CARES Act sets forth the criteria that the SBA must use to determine eligibility under the CARES Act. The criteria are specific and they are exclusive; the applicant must make a "good faith certification" of four things—and only four things—in order to establish eligibility for the PPP: (1) that the uncertainty of current economic conditions makes necessary

8

the loan request to support the ongoing operations" of the loan recipient; (2) that the funds will be used for certain specified permissible purposes; (3) that the applicant does not have another duplicative application pending for an SBA loan; and (4) that the applicant has not received a duplicative SBA loan. That is all that the CARES Act requires for borrower eligibility. In setting forth these four requirements for borrower eligibility, Congress chose not to make creditworthiness—or risk of non-repayment—a factor in determining borrower eligibility. Because Congress has spoken to the precise issue of borrower requirements for participation in the PPP in the CARES Act, there is no room for the SBA to impose an additional requirement. *See Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *Catskills Mts. Chptr of Trout Unlimited v. EPA*, 846 F.3d 492, 508 (2d Cir. 2017) (applying two-step Chevron deference analysis).

The conclusion that Congress did not intend to make debtors in bankruptcy ineligible for the PPP is also supported by the fact that a different program authorized by the CARES Act does specifically exclude debtors in bankruptcy from eligibility. In addition to the PPP, which applies principally to small businesses, the CARES Act establishes a separate loan program for mid-sized businesses administered by the Treasury Department. Like the PPP, the loan program for mid-sized businesses has specific statutory eligibility requirements and relies on borrower certification to establish eligibility. But unlike the PPP, the loan program for mid-sized businesses specifically excludes debtors in bankruptcy.[8] Section 4003(c)(3)(D) sets forth the borrower requirements for loans to mid-size businesses. The statute provides:

---

[8] Participation in the PPP is limited to small businesses, defined as businesses with fewer than 500 employees, and larger businesses that operate in certain industries. *See* First Interim

(D)    ASSISTANCE FOR MID-SIZED BUSINESSES.—

(i)    IN GENERAL.—Without limiting the terms and conditions of the programs and facilities that the Secretary may otherwise provide financial assistance to under subsection (b)(4), the Secretary shall endeavor to seek the implementation of a program or facility described in subsection (b)(4) that provides financing to banks and other lenders that make direct loans to eligible businesses including, to the extent practicable, nonprofit organizations, with between 500 and 10,000 employees, with such direct loans being subject to an annualized interest rate that is not higher than 2 percent per annum. For the first 6 months after any such direct loan is made, or for such longer period as the Secretary may determine in his discretion, no principal or interest shall be due and payable. Any eligible borrower applying for a direct loan under this program shall make a good-faith certification that—

(I)    the uncertainty of economic conditions as of the date of the application makes necessary the loan request to support the ongoing operations of the recipient;

(II)    the funds it receives will be used to retain at least 90 percent of the recipient's workforce, at full compensation and benefits, until September 30, 2020;

(III)    the recipient intends to restore not less than 90 percent of the workforce of the recipient that existed as of February 1, 2020, and to restore all compensation and benefits to the workers of the recipient no later than 4 months after the termination date of the public health emergency declared by the Secretary of Health and Human Services on January 31, 2020, under section 319 of the Public Health Services Act (42 U.S.C. 247d) in response to COVID–19;

(IV)    the recipient is an entity or business that is domiciled in the United States with significant operations and employees located in the United States;

(V)    *the recipient is not a debtor in a bankruptcy proceeding*;

(VI)    the recipient is created or organized in the United States or under the laws of the United States and has significant operations in and a majority of its employees based in the United States;

---

Rule at 5. The Treasury Department's loan program is limited to mid-sized businesses, defined as businesses with between 500 and 10,000 employees. CARES Act § 4003(c)(3)(D)(i).

10

(VII)   the recipient will not pay dividends with respect to the common stock of the eligible business, or repurchase an equity security that is listed on a national securities exchange of the recipient or any parent company of the recipient while the direct loan is outstanding, except to the extent required under a contractual obligation that is in effect as of the date of enactment of this Act;

(VIII)   the recipient will not outsource or offshore jobs for the term of the loan and 2 years after completing repayment of the loan;

(IX)   the recipient will not abrogate existing collective bargaining agreements for the term of the loan and 2 years after completing repayment of the loan; and

(X)   that the recipient will remain neutral in any union organizing effort for the term of the loan.

CARES Act § 4003(c)(3)(D) (emphasis added). In short, in establishing the two loan programs under the CARES Act, Congress carefully specified the eligibility criteria for each program. For the program for mid-sized businesses, Congress specifically decided to exclude debtors in bankruptcy. For the PPP, Congress decided not to exclude debtors in bankruptcy. Because Congress spoke to the issue, the SBA is not free to add additional requirements. *See Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *United States v. Shabani*, 513 U.S. 10, 14 (1994) ("In light of this additional element in the [related statute], Congress' silence in [in the statute at issue] speaks volumes.").

Moreover, the SBA's Third Interim Rule—the only regulation that even mentions bankruptcy—deviates not only from the CARES Act, but also from the SBA's own prior understanding of the PPP. The SBA's First Interim Rule acknowledges that, in the unique economic circumstances that gave rise to the PPP, it would be inappropriate for the SBA to add

11

additional requirements regarding borrower eligibility.  For that reason, the SBA clarified in the First Interim Rule that the SBA's general eligibility criteria for small business loans does not apply to the PPP.  *See* First Interim Rule at 5 ("[F]or loans made under the PPP, SBA will not require the lender to comply with section 120.150 'What are SBA's lending criteria?'").  But the Third Interim Rule does not even acknowledge the SBA's prior understanding that its traditional borrower requirements are inappropriate in the context of the PPP, much less attempt to justify the deviation from the CARES Act's borrower requirements, or the SBA's prior acknowledgment that additional requirements relating to creditworthiness are inappropriate.  The Third Interim Rule simply posits that there are heightened risks associated with debtors in bankruptcy and claims, without support, the power to exclude them.  In short, the Third Interim Rule conflicts both the CARES Act and the SBA's own prior regulation.  *See Singh v. U.S. Dep't of Justice*, 461 F.3d 290, 296 (2d Cir. 2006)(setting aside an agency action where "[t]he [agency's] decision, and the government's defense of it, expose a clear conflict between the relevant statute and the agency's corresponding regulation, which, to date, as far as we have found, [has] not been acknowledged let alone reconciled").  For these reasons, the SBA's implementation of the PPP in a manner that causes debtors in bankruptcy to be ineligible is "arbitrary, capricious, [or] an abuse of discretion" in violation of § 706(2)(A) of the APA.

In addition to the fact that there is nothing in the CARES Act that warrants disqualifying debtors in bankruptcy from participation in the PPP, there is nothing in the Bankruptcy Code that warrants a disqualification for bankruptcy debtors.  In fact, basic bankruptcy law would favor the availability of PPP financing for debtors, as the bankruptcy code provides a priority status to post-petition transactions with the debtor, including post-petition debt.  *See* 11 U.S.C. § 503 (providing priority for post-petition debt in the form of an administrative expense claim).

**Commented [A1]:** Check with Steve and Charlie

Finally, the U.S. Bankruptcy Court for the Southern District of Texas recently held, in an order granting a temporary restraining order and a preliminary injunction against the SBA, that CARES Act prohibited the SBA from excluding debtors in bankruptcy from participating in the PPP.  In *Hidalgo County Emergency Service Foundation v. Carranza et al.*, Adversary Case No. 20-2006 (Bankr. Ct. S.D. Tex. April 25, 2020), the plaintiff, a debtor in bankruptcy, filed an adversary proceeding in its underlying bankruptcy matter, alleging—as Plaintiffs allege here—that the SBA violated the CARES Act by disqualifying debtors in bankruptcy from participating in the PPP.  The Court granted the plaintiff's request for interim relief, holding that the plaintiff was likely to prevail on its claim.  *See* Temporary Restraining Order at 2, *Hidalgo County Emergency Service Foundation v. Carranza et al.*, Adversary Case No. 20-2006 (Bankr. Ct. S.D. Tex. April 25, 2020) (attached as Exhibit 2 to the Supplemental Declaration of Brian J. Butler, Esq. in Support of Motion for Preliminary Injunction dated April 27, 2020)*; see also* Transcript of Hearing, dated April 24, 2020, at 29, *Hidalgo County Emergency Service Foundation v. Carranza et al.*, Adversary Case No. 20-2006 (Bankr. Ct. S.D. Tex. April 25, 2020) (stating that SBA's argument that the agency retained the power to add creditworthiness criteria to the borrower requirements is "simply frivolous") (attached as Exhibit 3 to Supplemental Butler Declaration).

The Plaintiffs are the type of businesses that Congress intended, when it passed the CARES Act, that would benefit from the PPP and there is no indication that Congress intended to exclude bankruptcy debtors from participation in the PPP.  Therefore, there is no legal or factual basis that justifies the disqualification of bankruptcy debtors from the PPP, and as a result, the SBA determination to include debtor disqualifying criteria in the PPP Application and the PPP Lender Application was arbitrary and capricious in violation of § 706(2)(A) of the APA.

13

**II.**     **The PPP Applications Discriminate Against the Plaintiffs as Bankruptcy Debtors and Violate Section 525 of the Bankruptcy Code.**

Section 525(a) of the Bankruptcy Code provides in relevant part that "a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to . . . a person that is or has been a debtor under this title." 11 U.S.C. § 525(a).  This list is illustrative rather than exhaustive. *See, e.g.*, *Envtl. Source Corp. v. Mass. Div. of Occupational Safety* (In re Envtl. Source Corp.), 431 B.R. 315, 322 (Bankr. D. Mass. 2010).

The SBA is a governmental unit under the Bankruptcy Code and is not entitled to sovereign immunity. *See* 11 U.S.C. § 101(27); *see also* 11 U.S.C. § 106.  Section 106 is a general waiver of sovereign immunity as to "a governmental unit to the extent set forth in this section with respect to [section]. . . 525".  *See id.*  Further, section 106(a)(2) provides that the "court may hear and determine any issue arising with respect to the application of such sections to governmental units."

The legislative history of section 525(a) provides that the congressional intent was to "prohibit actions by governmental or quasi-governmental organizations . . . or by other organizations that can seriously affect the debtors' livelihood or fresh start." *See* S.REP. No. 989, 95th Cong., 2d Sess. 81 (1978), reprinted in 1978 U.S. CODE CONG. & ADMIN. NEWS 5787, 5867; H.R.Rep. No.595, 95th Cong., 1st Sess. 366-267 (1977); reprinted in 1978 U.S. CODE CONG. & ADMIN. NEWS 5963, 6322-6323.  The legislative history further provides that section 525:

> codifies the result of *Perez v. Campbell* . . . which held that a state would frustrate the Congressional policy of a fresh start for a debtor if it were permitted to refuse to renew a drivers license because a tort judgment resulting from an automobile accident had been unpaid as a result of a discharge in bankruptcy. The Section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the Perez rule.

*See id.*

Many of the cases involving section 525(a) relate to revocation of licenses and employment discrimination against individual debtors, but courts within the Second Circuit have interpreted the "or similar grant" language broadly to include government loan related assistance. *See, e.g.*, *In re Rose*, 23 B.R. 662 (Bankr. D. Conn. 1982). In *Rose*, the Bankruptcy Court for the District of Connecticut held that a state mortgage financing program could not deny a mortgage to a former debtor. *In re Rose*, at 666-67. The Court reasoned that "[i]f a state has chosen to enact a program of home financing for its citizens, § 525 prohibits that state from exempting debtors or bankrupts from those benefits solely because of bankruptcy and without taking into account present financial capability. To hold to the contrary would frustrate the Congressional policy of granting the debtor a fresh start by denying him a means open to other citizens of acquiring a home." *See id.*

Similarly, the Eastern District of New York Bankruptcy Court expanded on the *Perez* doctrine by holding that while section 525 "does not on its face embrace the refusal of money, credit or financing," it is not exhaustive, and "it was the legislative intent that the courts should continue to invalidate all discrimination of the character condemned in Perez v. Campbell". *In re Mart i.l.v.e.s. Goldrich*, 45 B.R. 514, 520 (Bankr. E.D.N.Y. 1984); *see also  Perez v. Campbell*, 402 U.S. 637, 91 S. Ct. 1704, 29 L. Ed. 2d 233 (1971). The *In re Mart* court ultimately held that "New York cannot refuse to guarantee a student loan to [a debtor] because an earlier loan was not paid but was discharged in bankruptcy," reasoning that the section 525 is violated if the governmental discrimination interferes with congressional policy of giving a debtor a fresh start. *See In re Mart i.l.v.e.s. Goldrich*, at 522-23 (holding that "that New York cannot refuse to guarantee a student loan to Goldrich because an earlier loan was not paid but was discharged in bankruptcy. . . . Section 661.6(b) of New York's Education Law frustrates the Congressional

15

policy of granting Goldrich a fresh start by denying him the means available to other citizens who have acquired a higher education. Therefore, under the authority of the Perez case, Section 661.6(b) is unconstitutional and the defendants should be enjoined from denying Goldrich because of it the loans he requests").

The Second Circuit has also held that section 525(a) prohibits the eviction of a debtor from public housing, even though the debtor failed to pay pre-petition rent, an obligation that was discharged in the bankruptcy case. *Stoltz v. Brattleboro Hous. Auth. (in Re Stoltz)*, 315 F.3d 80, 89 (2d Cir. 2002). The *Brattleboro Housing Authority* argued that a public housing lease was not an "other similar grant" contemplated under section 525 and that while the denial of the debtor's reapplication for a future lease was prohibited, that section 525 did not prohibit the eviction of the debtor for failure to pay prepetition rent. *See id.* The court disagreed reasoning "[t]he common qualities of the property interests protected under section 525(a), i.e., 'licenses, permits, charters, franchises, and other similar grants,' *are that these property interests are unobtainable from the private sector and essential to a debtor's fresh start.*" *See id.* (emphasis added).

The plaintiffs are otherwise eligible for a PPP loan but for their status as debtors, and as such, their "fresh start" is being interfered with by the SBA's implementation of the PPP program. It is beyond cavil that non-debtor faith-based organizations in New York are facing similar financial distress as the Plaintiffs in light of both COVID-19 and the New York "stay at home" directive. Those non-debtor faith-based organizations are eligible to participate in the PPP while the Plaintiffs are not solely because of their status as bankruptcy debtors. This is exactly the type of discrimination that Section 525 intends to prohibit.

The PPP is an unprecedented program designed to provide relief to small businesses affected by COVID-19. The Plaintiffs cannot obtain loans on similar terms from a private

16

institution because the main factor driving a bank's willingness to issue loans under the PPP is the SBA's guarantee of such loan. The Plaintiffs cannot have their "fresh start" if they are forced to lay off and furlough employees many of whom are crucial to their businesses as going concerns. As such, the Plaintiffs respectfully submit that the SBA's implementation of the PPP is discriminatory in violation of Section 525 of the Bankruptcy Code. *See* Temporary Restraining Order at 2, *Hidalgo County Emergency Service Foundation v. Carranza et al.*, Adversary Case No. 20-2006 (Bankr. Ct. S.D. Tex. April 25, 2020) (granting preliminary injunction and finding the plaintiffs were likely to prevail on claim that SBA discriminated against plaintiffs in violation of Section 525); *see also* Transcript of Hearing, dated April 24, 2020, at 32, *Hidalgo County Emergency Service Foundation v. Carranza et al.*, Adversary Case No. 20-2006 (stating that SBA's argument regarding Section 525 "lack[s] any good faith").

**III.    This Court Should Enjoin the SBA from Disqualifying the Plaintiffs as an Eligible Applicants Under the PPP.**

A movant is entitled to a preliminary injunction, even if it 'will affect government action taken in the public interest pursuant to a statute or regulatory scheme,' *Friends of the E. Hampton Airport Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (quoting *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011)), when the movant demonstrates "(1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by relief." *JBR, Inc. v. Keurig Green Mt., Inc.*, 618 F. App'x 31, 33 (2d Cir. 2015); *Am. Soc. of Composers, Authors, & Publishers by Bergman v. Pataki*, 930 F. Supp. 873, 877 (S.D.N.Y. 1996); *see also* 5 U.S.C. § 705 ("On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application

17

for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.").  Whether to grant a preliminary injunction is in the sound discretion of the Court.  *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 237 (2d Cir. 2001).  In this case, all four factors weigh heavily in favor of granting the Plaintiffs the injunctive relief requested.

      **a.  *Plaintiffs are Likely to Succeed on the Merits***

      Plaintiffs must demonstrate "a clear showing that [they are] entitled to the relief requested," or alternatively, a movant satisfies this factor "where extreme or very serious damage will result from a denial of preliminary relief." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985).

      As set forth above, the SBA's decision to disqualify bankruptcy debtors is beyond the agency's statutory authority and is arbitrary and capricious in violation § 706(2)(A) and (C) of the APA.  Further, the SBA's implementation of the PPP in a manner that precludes participation by bankruptcy debtors is discriminatory in violation of Section 525 of the Bankruptcy Code.  The Plaintiffs are likely to succeed on the merits of these claims.  Accordingly, this factor favors an award of preliminary injunction relief.

      Moreover, in the context of the Plaintiffs' bankruptcy proceedings, the likelihood of success typically equates to the probability of a successful plan of reorganization. *see e.g., Lane v. Phila. Newspapers, LLC (In re Phila. Newspapers, LLC)*, 423 B.R. 98, 106 (E.D. Pa. 2010).  Here, the imposition of a preliminary injunction will certainly improve the likelihood that the Plaintiffs will achieve a successful plan of reorganization.  It cannot be disputed that the ability of the Plaintiffs to maintain their employees and continue their mission and businesses as going concerns will greatly improve the likelihood of a successful plan.  For this reason as well, Plaintiffs have met their burden of showing that they are likely to succeed on the merits of their claims.

> **b. Plaintiffs Will Suffer Irreparable Harm if the SBA is Permitted to Disqualify Plaintiffs from the PPP**

It is axiomatic that preliminary injunctive relief is intended to protect movants from irreparable injury while the underlying action is pending, and as a result, "the linchpin of [preliminary injunctive] relief is that threatened irreparable harm will be prevented by that injunction." *Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975).

Here, a preliminary injunction is warranted to prevent irreparable harm to the Plaintiffs, their respective bankruptcy estates and case administration efforts. The PPP offers applicants guaranteed loans that are not otherwise obtainable in the private marketplace. Further, the PPP authorizes the SBA to guarantee a finite amount in PPP loans on a first come, first served basis. As such, once funds appropriated by Congress for PPP loans are exhausted, the PPP will no longer be available to the Plaintiffs. Accordingly, the Plaintiffs are unlawfully being prohibited from participating in the PPP solely because of their status as debtors. Without a preliminary injunction preventing the SBA from disqualifying the Plaintiffs from the PPP based on their status as a debtors, the Plaintiffs will be foreclosed from PPP participation completely.

The PPP has a finite amount of funding available to it and the overwhelming demand for PPP loans will deplete that funding rapidly, perhaps in just a few days. Accordingly, the Plaintiffs will not be able to obtain the extraordinary benefits under the PPP once those funds are depleted. In this case, the harm to Plaintiffs from being disqualified from the PPP will be irreparable because once the PPP funding is fully disbursed, there will be no way for the Plaintiffs to later obtain a similar loan on such favorable terms. *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999) (holding that absent a preliminary injunction, "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they

previously occupied"). Therefore, the Plaintiffs have met their burden of showing that they will suffer imminent irreparable harm in the absence of an injunction, and as a result, this factor weighs in favor of granting injunctive relief.

### c. Balance of Harms Weighs Heavily in Favor of Issuing a Preliminary Injunction

The balance of the harms also favors the Plaintiffs.  While the Plaintiffs can point to definite, quantifiable, harm that they will suffer and that will occur to their bankruptcy estates and case administration efforts absent a PPP loan, it is difficult perceive what harm, if any, the SBA would suffer if the Court were to grant the requested relief.  Indeed, the SBA is charged under the CARES Act to guarantee billions in loans to businesses that are navigating the same COVID-19 related issues as the Plaintiffs.  Accordingly, there would no cognizable harm to the SBA if they were to guarantee loans to otherwise PPP eligible bankruptcy debtors. Therefore, the balance of harms weighs heavily in favor of granting a preliminary injunction, and as a result, this factor weighs in favor of the Plaintiffs.

### d. Granting the Requested Injunction is in the Public Interest

The public interest weighs in favor of issuing a preliminary injunction.  The public will not be injured by the entry of an injunction in this case as the SBA is charged under the CARES Act to administer the PPP to the benefit of small businesses that are eligible.  There will be no cognizable impact on the SBA, or to taxpayers, if the SBA were to guarantee loans to otherwise PPP eligible bankruptcy debtors, because the available pool of PPP funds will be gone within a short period of time regardless.  Further, the Plaintiffs are not-for-profit entities that carry out charitable and religious missions.  There is a strong public interest in preserving the Plaintiffs' ability to continue operating in this time of unprecedented pandemic and the retention of Plaintiffs'

employees are essential to allow Plaintiffs to continue with their mission and business as going concerns.

Additionally, courts have held that "timely resolution of the bankruptcy estate" is in the public interest. *In re W.R. Grace & Co.*, 412 B.R. 657, 666 (D. Del. 2009); *see also In re Am. Film Techs., Inc.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) ("It is 'one of the paramount interests' of this court to assist the Debtor in its reorganization efforts."); *Rickel Home Centers, Inc. v. Baffa (In re Rickel Home Centers, Inc.)*, 199 B.R. 498, 501 (Bankr. D. Del. 1996) ("[T]here is a strong public interest in promoting a successful Chapter 11 reorganization."). The ability of the Plaintiffs to maintain their employees to assist with the administration of their chapter 11 cases will certainly contribute to the timely resolution of the bankruptcy estate.

Accordingly, there is a strong public interest in awarding a preliminary injunction to prevent the SBA from disbursing all the proceeds of the PPP program before the Court has the opportunity to adjudicate the Plaintiffs' claims. As a result, this factor weighs in favor of granting Plaintiffs' motion.

<u>**CONCLUSION**</u>

For the forgoing reasons, Plaintiffs request that the Court issue a preliminary injunction (1) prohibiting the SBA from denying the Plaintiffs a loan under the PPP based on the Plaintiffs' status as chapter 11 debtors or otherwise taking any action, or failing to take any action, in the processing of Plaintiffs' PPP applications, that would disqualify Plaintiffs from participating in, or limit Plaintiffs' access to, the PPP based Plaintiffs' status as chapter 11 debtors, and (2) enjoining the SBA from disbursing from the PPP an amount equal to the total amount requested in the Plaintiffs' combined loan applications, or $2,836,096.

Dated:  April 27, 2020                    BOND, SCHOENECK & KING, PLLC

By: _____
Stephen A. Donato
Charles J. Sullivan
Brian J. Butler
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
sdonato@bsk.com
csullivan@bsk.com
bbutler@bsk.com

*Attorneys for the Plaintiffs*

22