UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THE DIOCESE OF ROCHESTER and THE
DIOCESE OF BUFFALO, N.Y.,

                  Plaintiffs,

          v.

U.S. SMALL BUSINESS
ADMINISTRATION and JOVITA
CORRANZA, *solely as the Administrator of
the U.S. Small Business Association*,

                Defendants.
_____

**DECISION AND ORDER**

6:20-CV-06243 EAW

## <u>INTRODUCTION</u>

Plaintiffs the Diocese of Rochester and the Diocese of Buffalo, N.Y. (collectively "Plaintiffs") seek a preliminary injunction against defendants U.S. Small Business Administration ("SBA") and Jovita Corranza (the "Administrator") (collectively "Defendants") related to Defendants' establishment of criteria for participation in the Paycheck Protection Program (the "PPP"). (Dkt. 17). Plaintiffs assert that Defendants violated the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (the "APA") and Section 525(a) of the Bankruptcy Code, 11 U.S.C. § 525(a), by determining that debtors in bankruptcy are not eligible for loans issued in connection with the PPP. Plaintiffs ask the Court to enjoin Defendants from (1) denying Plaintiffs a PPP loan or otherwise interfering with the processing of their applications due to their status as chapter 11 bankruptcy debtors

and (2) "disbursing from the PPP an amount equal to the total amount requested in [Plaintiffs'] combined loan applications, or $2,836,096."  (Dkt. 17 at 1).

Following oral argument on Plaintiffs' amended motion for a preliminary injunction, the Court issued a Notice pursuant to Federal Rule of Civil Procedure 56(f)(3) advising the parties that it intended to consider granting summary judgment with respect to the following issues: (1) whether the SBA exceeded its statutory authority under the Coronavirus Aid, Relief, and Economic Security Act ("CARES"), Pub. L. No. 116-136, 134 Stat. 281 (2020), by excluding debtors in bankruptcy from participation in the PPP; and (2) whether the SBA violated 11 U.S.C. § 525(a) by excluding debtors in bankruptcy from participation in the PPP.  (Dkt. 35)

For the reasons set forth below, the Court concludes that those legal questions must be resolved in favor of Defendants—the SBA did not exceed its statutory authority under the CARES Act nor did it violate 11 U.S.C. § 525(a) when it adopted the bankruptcy exclusion to the PPP.  As a result, the Court grants summary judgment to Defendants to the extent Plaintiffs seek a declaratory judgment otherwise.  The Court further denies Plaintiffs' amended motion for a preliminary injunction because they have not demonstrated a likelihood of success as to the remaining claims in this matter nor have they established irreparable harm.

## FACTUAL BACKGROUND

Plaintiffs are Roman Catholic dioceses and not-for-profit religious corporations under New York law.  (Dkt. 10 at ¶¶ 4-5).  Both Plaintiffs are chapter 11 bankruptcy debtors, with the Diocese of Buffalo having filed its voluntary petition on February 28,

2020 (Dkt. 2-5 at ¶ 3) and the Diocese of Rochester having filed its voluntary petition on September 12, 2019 (Dkt. 2-7 at ¶ 3).

On March 20, 2020, as a result of the ongoing global COVID-19 pandemic,[1] New York State Governor Andrew M. Cuomo signed the "New York State on PAUSE" Executive Order, which, among other things, mandated a 100% closure of non-essential businesses statewide and temporarily banned all non-essential gatherings of individuals of any size for any reason other than the provision of essential services.   Executive Order [Cuomo] No. 202.8 (Mar. 20, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/ files/atoms/files/EO_202.8.pdf; *see New York State on PAUSE*, New York State: Novel Coronavirus, https://coronavirus.health.ny.gov/new-york-state-pause (last visited June 10, 2020).  Plaintiffs allege that this had a significant impact on their revenue sources.  (Dkt. 10 at ¶ 38).

Specifically, a "primary source of revenue" for Plaintiffs is "parish assessments" which are collected from parishes on a monthly basis and are "based primarily on historical parish offertory."  (Dkt. 2-5 at ¶ 5; *see also* Dkt. 2-7 at ¶ 5).   In turn, the parishes "derive a significant portion of their revenue from offertory collection during masses," particularly "during Holy Week which includes Easter Sunday mass."  (Dkt. 2-5 at ¶ 7).   However, because the New York State on PAUSE Order prevented the parishes from holding masses

---

[1]     On March 13, 2020, the President declared a National Emergency concerning COVID-19. Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).  According to the World Health Organization's website, as of June 10, 2020, there were 7,145,539 confirmed cases of COVID-19 worldwide, with 408,025 confirmed deaths.  *See Coronavirus (COVID-19)*, World Health Org., https://covid19.who.int/ (last visited June 10, 2020).

or services, including on Easter Sunday (which occurred on April 12, 2020), "it is estimated that the parish offertory collections and contributions from parishioners are 90-95% lower than average." (*Id.* at ¶ 8).  The Diocese of Buffalo employs 108 full-time employees and 48 part-time employees.  (*Id.* at ¶ 10).  The Diocese of Rochester employs "60 to 70 full-time equivalent employees. . . ."  (Dkt. 2-7 at ¶ 9).

On March 27, 2020, the President signed into law the CARES Act which, among other things, established the PPP.  The PPP is "a convertible loan program under § 7(a) of the Small Business Act (15 U.S.C. § 633(a))."  *In re Springfield Med. Care Sys., Inc.*, No. 19-10285, 2020 WL 2311881, at *5 (Bankr. D. Vt. May 8, 2020).  As another federal court recently explained:

> The PPP is a new loan program to be administered by the SBA under Section 7(a) of the Small Business Act (codified at 15 U.S.C. § 636(a)).  Its purpose is to assist small businesses during the COVID-19 crisis by immediately extending them loans on favorable terms.  The loans are made by the SBA's participating banks and guaranteed by the SBA itself.  Section 1106 of the CARES Act provides that a borrower's indebtedness under a PPP loan will be forgiven to the extent that the borrower uses the funds to pay expenses relating to payroll, mortgage interest, rent, and utilities during the eight-week period following the loan's origination.  CARES Act § 1106.  If a borrower qualifies for loan forgiveness, the SBA must pay the lender an amount equal to the amount forgiven, plus any interest accrued through the date of payment.  *Id.* § 1106(c)(3).

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, __ F. Supp. 3d __, 2020 WL 2088637, at *2 (E.D. Wis. May 1, 2020), *appeals filed*, Nos. 20-1729, 20-1730 (7th Cir. May 4, 2020).[2]  Congress initially provided the SBA with $349 billion for PPP loan

---

[2]    As discussed further below, certain aspects of the PPP, including the eight-week period for using the funds, have been modified by the enactment of the Paycheck Protection Program Flexibility Act of 2020 on June 5, 2020.

guarantees, but those funds were quickly exhausted, and "Congress then appropriated an additional $310 billion for loan guarantees under the PPP." *DV Diamond Club of Flint, LLC v. U.S. Small Bus. Admin.*, __ F. Supp. 3d __, No. 20-CV-10899, 2020 WL 2315880, at *3 (E.D. Mich. May 11, 2020), *appeal filed*, No. 20-1437 (6th Cir. May 15, 2020).

The CARES Act grants the SBA emergency rule-making authority to issue regulations necessary to administer the PPP.  CARES Act § 1114.  On April 2, 2020, the SBA issued an interim final rule (the "First Interim Rule") that provided guidance on the eligibility requirements for participation in the PPP.  (*See* Dkt. 2-3 at 2-32).  The First Interim Rule was subsequently published in the Federal Register on April 15, 2020.  Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120); (*see* Dkt. 24 at 12-13).  The First Interim Rule makes reference to the "Paycheck Protection Application Form" (SBA Form 2484), First Interim Rule, 85 Fed. Reg. at 20816, which in turn requires a potential borrower to certify that it is "not presently involved in a bankruptcy," (Dkt. 24-1 at 29).

On April 28, 2020, SBA posted a new interim final rule.[3]  Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23450 (Apr. 28, 2020) (to be codified at 13 C.F.R. pts. 120-21) (hereinafter the "Fourth Interim Rule").  The Fourth

---

[3]     SBA issued second and third interim final rules that do not address issues relevant in this litigation.  (*See* Dkt. 24 at 13 n.1); *see also* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20817 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 121); Business Loan Program Temporary Changes; Paycheck Protection Program—Additional Eligibility Criteria and Requirements for Certain Pledges of Loans, 85 Fed. Reg. 21747 (Apr. 20, 2020) (to be codified at 13 C.F.R. pt. 120).

Interim Rule expressly excludes debtors in bankruptcy from receiving a PPP loan, stating that "[t]he Administrator . . . determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans." *Id.* at 23451.

The Diocese of Buffalo has completed a PPP loan application and, but for the disqualification of debtors in bankruptcy by SBA, would be eligible to receive a PPP loan in the amount $1,736,408. (Dkt. 17-1 at ¶ 4). The Diocese of Rochester has completed a PPP loan application and, but for the disqualification of debtors in bankruptcy by SBA, would be eligible to receive a PPP loan in the amount $1,100,000. (Dkt. 17-2 at ¶ 4).

## PROCEDURAL BACKGROUND

Plaintiffs commenced the instant action on April 15, 2020, and concurrently filed a motion for a preliminary injunction and a motion to expedite. (Dkt. 1; Dkt. 2; Dkt. 3). The Court granted the motion to expedite on April 16, 2020, and ordered Defendants to respond to the motion for a preliminary injunction by April 24, 2020. (Dkt. 6).

Plaintiffs filed an Amended Complaint on April 20, 2020. (Dkt. 10). Then, on April 24, 2020, the parties requested and the Court entered a stipulated motion scheduling order governing the filing of an amended motion for a preliminary injunction. (Dkt. 15; Dkt. 16). Pursuant to the stipulated motion scheduling order, Plaintiffs filed the pending amended motion for a preliminary injunction on April 27, 2020. (Dkt. 17). Defendants filed a response on May 8, 2020 (Dkt. 24), and Plaintiffs filed a reply on May 11, 2020 (Dkt. 26). Oral argument on the amended motion for a preliminary injunction was held on May 15, 2020, and continued on May 19, 2020. (Dkt. 30; Dkt. 32).

At oral argument, the Court informed the parties that it was considering issuing a notice pursuant to Federal Rule of Civil Procedure 56(f)(3) identifying matters as to which summary judgment was potentially appropriate, and asked the parties to file letters as to their positions on whether there were any issues of material fact that would preclude the issuance of such notice.  The parties filed the requested letters on May 21, 2020.  (Dkt. 33; Dkt. 34).   The Court issued its Rule 56(f)(3) Notice on May 22, 2020.   (Dkt. 35). Defendants filed a supplemental brief on May 28, 2020 (Dkt. 36), and Plaintiffs filed a supplemental brief on May 29, 2020 (Dkt. 37).

On June 5, 2020, the President signed into law the Paycheck Protection Program Flexibility Act of 2020, Pub. L. 116-142 (2020) (hereinafter the "PPPFA"), which modifies the forgiveness requirements for PPP loans.  With leave of Court (Dkt. 39), the parties filed letter briefs addressing the impact of the PPPFA on the instant litigation on June 8, 2020. (Dkt. 40; Dkt. 41).

## DISCUSSION

### I.     Referral to Bankruptcy Court

Although no party raised the issue in their briefing, the Court notes as an initial matter that pursuant to 28 U.S.C. § 157(a), "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." This District has exercised such authority, providing in Local Rule of Civil Procedure 5.1(f) that "any and all cases under Title 11 and any and all proceedings arising under Title 11 or arising in or related to a case under Title 11 are referred to the Bankruptcy Judges for this

district."  "An action is considered 'related to' a bankruptcy proceeding if the outcome of the litigation 'might have any "conceivable effect" on the bankrupt estate,' or has 'any significant connection with the bankrupt estate.'"  *Pennock v. Dean*, No. 06-CV-266S F, 2007 WL 542132, at *3 (W.D.N.Y. Feb. 15, 2007) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) (internal quotation omitted)).  Here, it indisputable that this action is, at a minimum, related to the bankruptcy proceeding, particularly because Plaintiffs acknowledge that even if they were eligible to receive a PPP loan, they would need to make a motion to the Bankruptcy Court seeking "approval of the loan pursuant to section 364 of the Bankruptcy Code before consummating the loan."  (Dkt. 2-5 at ¶ 17; Dkt. 2-7 at ¶ 17).  Moreover, Plaintiffs' claim that Defendants have violated 11 U.S.C. § 525(a), a provision of the Bankruptcy Code, arises under Title 11.  Accordingly, pursuant to Local Rule 5.1(f), the matter has been referred to the Bankruptcy Court.

The referral having been made, this Court may withdraw it "in whole or in part, . . . on its own motion or on timely motion of any party, for cause shown."  28 U.S.C. § 157(d). In other words, while Plaintiffs should have requested a withdrawal of the referral when they commenced the action, their failure to do so does not prevent the Court from determining *sua sponte* that withdrawal is appropriate.

"Section 157 does not define the term 'cause.'"  *In re Bernard L. Madoff Inv. Sec. LLC*, 612 B.R. 257, 262 (S.D.N.Y. 2020).  However: "[i]n deciding whether there is 'cause' to withdraw a bankruptcy reference, the Second Circuit has outlined several factors a district court should consider," which include "whether the claim or proceeding is core or non-core, whether it is legal or equitable, and considerations of efficiency, prevention of

forum shopping, and uniformity in the administration of bankruptcy law." *Id*. (quoting *In re Orion Pictures Corp*., 4 F.3d 1095, 1101 (2d Cir. 1993)).  "[T]he Court has broad discretion to withdraw the reference for cause."  *Id*. (citations omitted).

Turning first to the issue of whether the claims are core or non-core, the Court notes that "[w]hile most courts continue to follow some version of the *Orion* framework, the Supreme Court's subsequent decision in *Stern v. Marshall*, 564 U.S. 462 (2011) has called into question the usefulness of asking whether a claim is 'core' or 'non-core' in evaluating a motion to withdraw."  *In re Jacoby & Meyers-Bankr. LLP*, No. 14-10641 (SCC), 2017 WL 4838388, at *3 (S.D.N.Y. Oct. 25, 2017).  In *Stern*, the Supreme Court held that "the mere characterization of a claim as 'core' or 'non-core' . . . does not suffice to determine whether a bankruptcy court has the constitutional authority to adjudicate it."  *Id*. (footnote omitted); *see Stern*, 564 U.S. at 469.  As such, following *Stern*, courts in this Circuit have "updated the first factor in the *Orion* analysis, asking not whether the claim is core or non-core, but rather whether the bankruptcy court has authority to finally adjudicate the matter."  *Id*. (citation and quotation omitted).

Here, it is not clear whether the Bankruptcy Court would have the authority to finally adjudicate Plaintiffs' claims under the APA.  *Compare  In re Skefos*, No. 19-29718-L, 2020 WL 2893413, at *3 (Bankr. W.D. Tenn. June 2, 2020) (concluding that the bankruptcy court did have such authority), *with Schuessler v. U.S. Small Bus. Admin.*, No. AP 20-02065-BHL, 2020 WL 2621186, at *2 (Bankr. E.D. Wis. May 22, 2020) (concluding with respect to the plaintiff's APA claims that "the bankruptcy court may hear them, but cannot issue final orders or judgments without the parties' consent").  This lack

- 9 -

of clarity supports withdrawing the referral, to avoid a potential scenario in which arguments over the scope of the Bankruptcy Court's jurisdiction consume time and resources.

Withdrawing the referral in this case will also promote judicial efficiency, ensure uniformity in the treatment of both Plaintiffs' claims, and avoid unnecessary delay. Further, when the Court raised the issue at oral argument, both sides agreed that withdrawal of the referral was appropriate.  For all these reasons, the Court withdraws the referral of this matter to the Bankruptcy Court in its entirety.

## II.   **Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(f)(3), "[a]fter giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."   In this case, as set forth above, the Court—after confirming with the parties that there were no material facts genuinely in dispute—notified the parties that it intended to consider whether summary judgment was warranted on two of Plaintiffs' claims: (1) whether the SBA exceeded its statutory authority under the CARES Act by excluding debtors in bankruptcy from participation in the PPP; and (2) whether the SBA violated 11 U.S.C. § 525(a) by excluding debtors in bankruptcy from participation in the PPP.  (Dkt. 35).  The Court further afforded the parties the opportunity to file additional briefs following issuance of its Rule 56(f)(3) Notice.  (*Id.* at 2).  Accordingly, the requirements of Rule 56(f)(3) have been met.

"Questions of statutory construction and legislative history present legal issues that may be resolved by summary judgment." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *see also In re Asher*, 488 B.R. 58, 64 (Bankr. E.D.N.Y. 2013) ("Because the Defendants and the Plaintiff have themselves defined the relevant issue as a question of statutory construction, this dispute is particularly well-suited for resolution by summary judgment."). Here, with respect to the two issues set forth in the Court's Rule 56(f)(3) Notice, the parties and the Court are in agreement that there are no material factual disputes and that the questions of statutory construction are dispositive. The Court accordingly resolves those questions below.

A.    **Statutory Authority Under the CARES Act**

The APA empowers courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Courts in the Second Circuit "evaluate challenges to an agency's interpretation of a statute that it administers within the two-step *Chevron* [*v. U.S.A, Inc. v. NRDC*, 467 U.S. 837 (1984)] deference framework." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. E.P.A.*, 846 F.3d 492, 507 (2d Cir. 2017), *cert. denied sub nom. New York v. E.P.A.*, 138 S. Ct. 1164 (2018), and *cert. denied sub nom. Riverkeeper, Inc. v. E.P.A.*, 138 S. Ct. 1165 (2018). At step one, the Court asks whether the relevant statutory language is "silent or ambiguous" regarding the issue at hand. *Id.* (quoting *Chevron*, 467 U.S. at 843). At step two, the Court askes "whether the agency's answer is based on a permissible construction of the statute at issue . . . *i.e.*, if it is not arbitrary, capricious, or manifestly contrary to the statute." *Id.* (quotations and

citations omitted).  If the agency's interpretation is permissible, the Court will accord it deference "so long as it is supported by a reasoned explanation, and so long as the construction is a reasonable policy choice for the agency to make." *Id.* (quotation omitted). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43 (footnote omitted).

Here, Plaintiffs argue that the exclusion of debtors in bankruptcy from participation in the PPP contravenes Congress' clear, unambiguous intent as reflected in the CARES Act.  (Dkt. 18 at 12-14).  This argument has been accepted by other federal courts.  For example, the *DV Diamond* court held that, in enacting the CARES Act, "Congress . . . establish[ed] only two criteria for PPP loan guarantee eligibility and provid[ed] that *any* business concern *shall* be eligible for a PPP loan guarantee if it met those criteria."  2020 WL 2315880, at *1 (citations and alterations omitted).  Those two criteria are purportedly derived from § 1102(a)(36)(D)(i)(I) of the CARES Act, which provides as follows:

> During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 657a(b)(2)(C) of this title shall be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of--
> (I)     500 employees; or
> (II)    if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates.

15 U.S.C. § 636(a)(36)(D)(i).  Thus, according to this reasoning, so long as a business satisfies the two criteria identified in this section (*i.e.*, (1) during the covered period (2) it

must have less than 500 employees or less than the size standard in number of employees established by the Administration for the industry in which the business operates), then the business qualifies for loan guarantee eligibility under the PPP. *DV Diamond*, 2020 WL 2315880, at *10.

The reasoning employed by the *DV Diamond* court, among others, is not unpersuasive on its face. As the *DV Diamond* court noted, the Supreme Court has held that, "the word 'any' naturally carries an expansive meaning" and "[w]hen used (as here) with a singular noun in affirmative contexts, the word 'any' ordinarily refers to a member of a particular group or class without distinction or limitation and in this way implies *every* member of the class or group." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) (citations, quotations, and original alterations omitted); *see DV Diamond*, 2020 WL 2315880, at *10. In other words, the argument goes, when Congress says "any business concern, nonprofit organization, veterans organization, or Tribal business concern," it means <u>any</u>.

However, "[i]n making the threshold determination under *Chevron*, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (quotation omitted). To the contrary, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.* (quotation omitted). And in this case, when examined in the context of the statutory scheme as a whole, it becomes clear that 15 U.S.C. § 636(a)(36)(D)(i) is

properly understood not as setting forth the exclusive criteria for participation in the PPP, but merely as expanding the size limitations that would otherwise have been in place.

The PPP is "administered by the SBA under Section 7(a) of the Small Business Act." *Camelot Banquet Rooms*, 2020 WL 2088637, at \*2.  Under normal circumstances, loans under Section 7(a) are available only to "small business concerns," as defined in applicable SBA regulations.  *See* 15 U.S.C. § 632(a)(1); *id.* § 636(a); *see, e.g.*, How Does SBA Define "Business Concern or Concern"?, 13 C.F.R. § 121.105 (2005).  In establishing the PPP, Congress expanded the size restrictions found in those regulations to allow larger businesses to qualify for participation.  *See* 15 U.S.C. § 636(a)(36)(D)(i) (providing that larger businesses are eligible for PPP participation "in addition to small business concerns").  However, the Court disagrees with Plaintiffs that in expanding the size restrictions, Congress unambiguously provided that there could be no other eligibility criteria.  *See Schuessler*, 2020 WL 2621186, at \*11 (Bankr. E.D. Wis. May 22, 2020) ("Given . . . the speed with which Congress adopted the CARES Act and wanted funds to be disbursed in the light of the pandemic, it is understandable that Congress did not spell out in the statute all requirements for PPP participation.  Instead, Congress entrusted the details to the SBA, engrafting the PPP on to the SBA's existing section 7(a) lending program, and giving the SBA emergency rulemaking authority.").

Other provisions of the CARES Act clearly anticipate the existence of additional eligibility criteria.  For example, § 1102(a)(36)(D)(ii)(I) of the CARES Act provides that "[d]uring the covered period, individuals who operate under a sole proprietorship or as an independent contractor and eligible self-employed individuals shall be eligible to receive a

covered loan."  15 U.S.C. § 636(a)(36)(D)(ii)(I).  Further, § 1102(a)(36)(I) of the CARES Act waives the requirement that a small business concern be unable to obtain credit elsewhere in order to be eligible for a covered loan.  15 U.S.C. § 636(a)(36)(I).  These waivers of otherwise applicable eligibility requirements would be superfluous if, in fact, § 1102(a)(36)(D)(i) unambiguously eliminated any requirement beyond size.  It is "one of the most basic interpretive canons . . . that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation and original alterations omitted).

Moreover, as Defendants correctly point out, in interpreting statutes the Court must be mindful that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  In this case, in issuing loans under Section 7(a), the SBA is statutorily required to ensure such loans "shall be of such sound value or so secured as reasonably to assure repayment."  15 U.S.C. § 636(a)(6).  "[N]either the CARES Act nor the PPP expressly state that the SBA cannot consider creditworthiness of potential PPP borrowers or that it is relieved from its obligation to assure that all loans made under § 636(a) be of sound value to assure repayment."  *Henry Anesthesia Assocs. LLC* v. *Carranza*, No. 19-64159-LRC, 2020 WL 3002124, at *9 (Bankr. N.D. Ga. June 4, 2020) (quotations and original alteration omitted).  The Court will not presume that simply by using the phrase "any business" concern in one part of the CARES Act, Congress meant to implicitly eliminate the long-standing statutory

requirements for Section 7(a) loans. *See Jones v. United States*, 526 U.S. 227, 234 (1999)

("Congress is unlikely to intend any radical departures from past practice without making

a point of saying so.").

Plaintiffs have also argued that the bankruptcy exclusion is inconsistent with

§ 1102(a)(2) of the CARES Act, which provides as follows:

BORROWER REQUIREMENTS.—

(i) CERTIFICATION.—An eligible recipient applying for a covered
loan shall make a good faith certification—

(I) that the uncertainty of current economic conditions makes
necessary the loan request to support the ongoing operations of the
eligible recipient;

(II) acknowledging that funds will be used to retain workers
and maintain payroll or make mortgage payments, lease payments,
and utility payments;

(III) that the eligible recipient does not have an application
pending for a loan under this subsection for the same purpose and
duplicative of amounts applied for or received under a covered loan;
and

(IV) during the period beginning on February 15, 2020 and
ending on December 31, 2020, that the eligible recipient has not
received amounts under this subsection for the same purpose and
duplicative of amounts applied for or received under a covered loan.

15 U.S.C. § 636(a)(36)(G). Plaintiffs contend that by setting forth these limited

certification requirements, "Congress chose not to make creditworthiness—or risk of non-

repayment—a factor in determining borrower eligibility." (Dkt. 18 at 14). This argument

is misplaced. Section 1102(a)(2) of the CARES Act does not establish eligibility criteria

for participation in the PPP—to the contrary, the use of the phrase "[a]n eligible recipient"

presupposes that eligibility has already otherwise been ascertained. Nothing in § 1102(a)(2) addresses the issue of whether the SBA may exclude debtors in bankruptcy from participation in the PPP—instead, this section concerns the information a borrower must provide after eligibility has been determined.

For all these reasons, the Court concludes at step one of the *Chevron* analysis that the CARES Act is silent regarding the eligibility of debtors in bankruptcy to participate in the PPP. Put differently, nothing in the CARES Act requires that a bankrupt debtor be eligible for participation in the PPP—this detail was left by Congress for determination by the SBA. *See Penobscot Valley Hosp. v. Carranza*, No. 19-10034, 2020 WL 3032939, at *8 (Bankr. D. Me. June 3, 2020) ("Congress did not explicitly say whether debtors in bankruptcy are categorically excluded from the PPP. . . . Congress intended the SBA to fill a statutory gap and determine whether debtors in bankruptcy would be eligible for the PPP. As a result, in evaluating the APA claim, the Court proceeds to the second step of the *Chevron* framework.").

The Court thus turns to step two of the *Chevron* analysis and asks whether the SBA's adoption of the bankruptcy exclusion was "arbitrary, capricious, or manifestly contrary to the statute. . . ." *Catskill Mountains*, 846 F.3d at 520 (quotation omitted). As a threshold issue, the Court notes that the inquiry into arbitrariness at *Chevron* step two is distinct from the inquiry into arbitrariness under § 706(2)(A) of the APA, which allows a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Second Circuit has explained, "the standard for evaluating agency action under APA § 706(2)(A) [is] set forth in *Motor*

*Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29 (1983) ('State Farm')" and entails "a much stricter and more exacting review of the agency's rationale and decisionmaking process than the Chevron Step Two standard." *Catskill Mountains*, 846 F.3d at 521. "*State Farm* is used to evaluate whether a rule is procedurally defective as a result of flaws in the agency's decisionmaking process" while "*Chevron*, by contrast, is generally used to evaluate whether the conclusion reached as a result of that process—an agency's interpretation of a statutory provision it administers—is reasonable." *Id*.

While Plaintiffs have brought a challenge to the SBA's adoption of the bankruptcy exclusion pursuant to § 706(2)(A), the Court expressly stated in its Rule 56(f)(3) Notice that it was not considering summary judgment as to this claim. (*See* Dkt. 35). The Court has instead limited its summary judgment inquiry into whether the bankruptcy exclusion is arbitrary and capricious as that phrase is used at *Chevron* step two—that is, whether "it is not supported by a reasoned explanation." *Catskill Mountains*, 846 F.3d at 521.

The SBA has offered a reasoned explanation for the bankruptcy exclusion. As set forth in its papers, under normal circumstances, the SBA fulfills is statutory mandate to ensure that Section 7(a) loans are of sound value by performing individual credit reviews. (Dkt. 24 at 27). However, in order to ensure that PPP loans are processed expeditiously, as the CARES Act clearly intended, the SBA decided to streamline processing by imposing a bright line exclusion of debtors in bankruptcy. (*Id*.). The SBA explained in the Fourth Interim Rule that it had adopted this bright line rule because it had determined that "providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of

an unauthorized use of funds or non-repayment of unforgiven loans."  85 Fed. Reg. at

23451.  Regardless of the Court's view of the soundness of this determination as a matter

of policy, it is sufficiently reasoned that the Court must defer thereto.  *See Penobscot Valley*

*Hosp.*, 2020 WL 3032939, at *9 ("The SBA's bankruptcy exclusion was a reasonable effort

to accommodate the conflicting policies committed to the SBA's care, and one that

Congress might reasonably have sanctioned.").

For all these reasons, the Court finds as a matter of law that the SBA did not exceed

its statutory authority in adopting the bankruptcy exclusion and grants summary judgment

to Defendants as to Plaintiffs' request for a declaratory judgment to the contrary.

## B.    Compliance with 11 U.S.C. § 525(a)

The Court turns next to Plaintiffs' claim that the SBA's adoption of the bankruptcy

exclusion violated 11 U.S.C. § 525(a).   Section § 525(a) provides in relevant part that "a

governmental unit may not deny . . . a license, permit, charter, franchise, or other similar

grant to" a bankruptcy debtor.  11 U.S.C. § 525(a).   "Section 525(a) evolved from *Perez*

*v. Campbell*, 402 U.S. 637 (1971), a seminal bankruptcy case in which the Supreme Court

struck down a state statute that withheld driving privileges from debtors who failed to

satisfy motor-vehicle-related tort judgments against them, even if the judgments were

discharged under bankruptcy law."  *In re Stoltz*, 315 F.3d 80, 87 (2d Cir. 2002).

The Second Circuit has held § 525(a) "does not promise protection against

consideration of the prior bankruptcy in post-discharge credit arrangements" and that

Congress did not intend to extend its protections "to cover loans or other forms of credit."

*In re Goldrich*, 771 F.2d 28, 30 (2d Cir. 1985) (holding that § 525(a) did not extend to

student loans)[4]; *see also Watts v. Pa. Hous. Fin. Co.*, 876 F.2d 1090, 1093 (3d Cir. 1989) (finding that § 525(a) did not extend to loans made under Pennsylvania's Homeowner's Emergency Mortgage Assistance Program).

Plaintiffs argue that a PPP loan is not a true loan, but should instead be understood as a grant. The Court disagrees. While it is true that a loan issued as part of the PPP is eligible for forgiveness if certain criteria are met, "[t]he existence of favorable terms and a unique feature (namely, forgiveness under specified circumstances) does not change the character of what the [Plaintiffs] want[] to obtain: a loan that might be forgiven by the lender." *Penobscot Valley Hosp.*, 2020 WL 3032939, at *11; *see also Schuessler*, 2020 WL 2621186, at *9 ("The record is clear that Congress created the PPP as an amendment to the SBA's pre-existing *loan* program and both the statute and agency regulations refer to the funds distributed as 'loans.' The PPP loans are made through private lenders and participants sign promissory notes, subject to SBA guarantees. While it is certainly true that Congress created the program to make the funds readily available, even where market

---

[4]      Subsequent to the Second Circuit's decision in *In re Goldrich*, Congress, as part of the Bankruptcy Reform Act of 1994, enacted 11 U.S.C. § 525(c), which states that "[a] governmental unit that operates a student grant or loan program and a person engaged in a business that includes the making of loans guaranteed or insured under a student loan program may not deny a student grant, loan, loan guarantee, or loan insurance to a person that is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, or another person with whom the debtor or bankrupt has been associated, because the debtor or bankrupt is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of a case under this title or during the pendency of the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act." Congress' decision to expressly address student loans in § 525(c) confirms that loans in general do not fall within the purview of § 525(a).

loans would not be, and the SBA has adopted regulations allowing the loans to be made with little-to-no underwriting, these attributes do not alter the fact that the program results in an actual loan.  It is also true that Congress provided for loan forgiveness if the funds are used in certain ways, but the loan forgiveness is just that—it is a *loan* forgiveness. Moreover, forgiveness is conditioned on future events; if a recipient fails to use the funds in one of the delineated ways, the recipient must pay back the loan.").

The Court further finds that even if PPP loans were properly characterized as "grants," they are not grants that are similar to a license, permit, charter, or franchise.  The Second Circuit has held that the "common qualities of the property interests protected under section 525(a) . . . are that these property interests are unobtainable from the private sector and essential to a debtor's fresh start."  *In re Stoltz*, 315 F.3d at 90 (finding public housing lease falls within the ambit of § 525(a)).  "The exclusion of persons involved in bankruptcy from the PPP does not conflict with the fresh start or otherwise frustrate the operation of the Bankruptcy Code" and is "not similar to denying a debtor a license to operate in his chosen field and thereby denying the debtor the opportunity to pursue economic betterment."  *Penobscot Valley Hosp.*, 2020 WL 30302939, at *14; *see also Henry Anesthesia Assocs.*, 2020 WL 3002124, at *7 ("Through the PPP, the government agrees to guarantee loans for eligible borrowers, and agrees to forgive those loans if certain conditions are met.  However, no legislative authority is required to contract for a loan, a loan guarantee, or even forgiveness of a loan, and all of these transactions can be obtained in the private market.").  Participation in the PPP bears no resemblance to any of the property interests enumerated in § 525(a).

- 21 -

For the reasons set forth above, the Court finds that the SBA did not run afoul of § 525(a) in adopting the bankruptcy exclusion.  Accordingly, the Court grants summary judgment to Defendants as to Plaintiffs' request for a declaratory judgment to that effect.

## III.   <u>Motion for Preliminary Injunction</u>

The Court turns next to Plaintiffs' amended motion for a preliminary injunction.  As a result of the Court's conclusions as to Plaintiffs' claims that the SBA exceeded its statutory authority under the CARES Act and violated § 525(a) in adopting the bankruptcy exclusion, the only claim that could potentially warrant entry of a preliminary injunction is Plaintiffs' claim that the SBA's actions were arbitrary and capricious pursuant to § 706(2)(A) of the APA.  The Court concludes for the reasons that follow that Plaintiffs have not demonstrated their entitlement to a preliminary injunction with respect to this claim.

### A.   <u>Legal Standard</u>

The standard for a preliminary injunction in the Second Circuit is as follows:

> In general, district courts may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quotations omitted).  However, "[a] plaintiff cannot rely on the fair-ground-for-litigation alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme."  *Id*. (quotations omitted).  In this context, the phrase "in the public interest" does not call upon the Court to make a value judgment, *see*

- 22 -

*Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (applying higher standard in lawsuit challenging the military's "Don't Ask, Don't Tell" policy after finding "it is inappropriate for this court to substitute its own determination of the public interest for that arrived at by the political branches, whether or not there may be doubt regarding the wisdom of their conclusion"), and the higher standard applies even if the party requesting a preliminary injunction or temporary restraining order "seeks to vindicate a sovereign or public interest," *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011).   The relevant inquiry is whether the governmental policy at issue was "implemented through legislation or regulations developed through presumptively reasoned democratic processes." *Able*, 44 F.3d at 131.  Here, Plaintiffs do not contest that they must satisfy the higher likelihood-of-success-on-the-merits standard.  (*See* Dkt. 18 at 22-23).

### B.    Sovereign Immunity

Defendants contend that this Court lacks the authority to issue a preliminary injunction against the SBA, because the sovereign immunity waiver in the Small Business Act provides that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the agency or its property."  (Dkt. 24 at 16 (quoting 15 U.S.C. § 634(b)(1) (emphasis and alterations omitted))).  Issues of sovereign immunity implicate the Court's subject matter jurisdiction, *see Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007), and subject matter jurisdiction is generally a "threshold issue," *Saleh v. Holder*, 84 F. Supp. 3d 135, 138 (E.D.N.Y. 2014).  However, in this case there is no dispute that the Court has jurisdiction over the merits of the underlying dispute—instead, the question is only whether the Court is empowered to grant a particular form of relief on

a preliminary basis before that underlying dispute is resolved.  Accordingly, because the Court concludes that the standard for issuance of a preliminary injunction has not been met, it need not and does not resolve this issue.

### C. <u>Likelihood of Success on the Merits</u>

In order to succeed on their claim that the SBA acted arbitrarily and capriciously as defined in § 706(2)(A) of the APA, Plaintiffs must show:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43.  The record before the Court is devoid of evidence sufficient to find that Plaintiffs are likely to succeed on such a claim.  While Plaintiffs have identified purported internal inconsistencies in the SBA's interim rules (*see* Dkt. 18 at 11-12), they have not persuasively argued that these claimed inconsistencies are so significant as to warrant setting aside the agency's actions, particularly in light of the necessarily expedited manner in which SBA was operating.  On the scant factual record regarding SBA's adoption of the bankruptcy exclusion,  the Court cannot conclude that Plaintiffs are likely to be able to demonstrate that the SBA acted arbitrarily and capriciously.

### D. <u>Irreparable Harm</u>

The Court further finds that Plaintiffs have not demonstrated that they will suffer irreparable harm in the absence of a preliminary injunction.  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation

omitted).  "Thus, if a party fails to show irreparable harm, a court need not even address the remaining elements of the test."  *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-CV-8028 (JMF), 2018 WL 2089342, at *1 (S.D.N.Y. May 3, 2018).  "To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation."  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quotations omitted).  Additionally, "irreparable harm must be shown to be actual and imminent, not remote or speculative."  *Id.*

Here, Plaintiffs' submissions regarding the financial impact of the COVID-19 pandemic and concomitant ban on church gatherings are vague.  Plaintiffs point out that offerings have dropped off precipitously, but they do not state what percentage of their funding comes from parish assessments versus other sources.  Plaintiffs further have not claimed that they need PPP funds in order to make payroll—indeed, there is no indication in Plaintiffs' papers that they have not paid their employees' salaries or that failure to obtain PPP funds would somehow cause Plaintiffs to cease to operate.  Instead, Plaintiffs argue that being excluded from the PPP is in and of itself irreparable harm, based on their assertions that "the demand for PPP funds greatly exceeds the available supply" and "the PPP funds are likely to become exhausted soon."  (*See* Dkt. 36 at 23).  However, Plaintiffs have provided no factual support for these assertions and they are contradicted by recent public reports indicating that there are more $120 billion dollars in PPP funds still available and that "most small businesses interested in the loan have already applied for it."  Kate Rogers, *After a Rush for More Small Business Funding, PPP Loan Money Remains*

- 25 -

*Untapped*, CNBC (June 2, 2020, 6:09 PM), https://www.cnbc.com/2020/06/02/billions-in-ppp-loan-money-remains-untapped-by-small-businesses.html.  In other words, there is no reason on the current record to conclude that, should they ultimately prevail in this litigation, Plaintiffs would be unable to apply for and receive PPP loans.  This is particularly true in light of the narrow issues remaining in this litigation, which should require fairly minimal discovery.

## **CONCLUSION**

For the reasons set forth above, the Court withdraws referral of this case from the Bankruptcy Court, grants summary judgment to Defendants on Plaintiffs' claims that the SBA exceeded its statutory authority under the CARES Act by excluding debtors in bankruptcy from participation in the PPP and that the SBA violated 11 U.S.C. § 525(a) by excluding debtors in bankruptcy from participation in the PPP, and denies Plaintiffs' amended motion for a preliminary injunction (Dkt. 17).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: June 10, 2020
       Rochester, New York